O

# United States District Court
# Central District of California

| | |
|---|---|
| AGCS MARINE INSURANCE CO., <br><br> Plaintiff, <br><br> v. <br><br> KOOL PAK LLC, <br><br> Defendant. | Case № 2:22-cv-02775-ODW (MARx) <br><br> **ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [18]** |

## I.   INTRODUCTION

Plaintiff AGCS Marine Insurance Company, as subrogee of its insured Ivar's Inc., brings this interstate shipping action against Defendant Kool Pak LLC to recover for damage to a shipment of clam chowder. (*See* Compl. ¶¶ 1–6, ECF No. 1.) Kool Pak moves for summary judgment. (Mot. Summ. J. ("Mot." or "Motion"), ECF No. 18.) The Motion is fully briefed. (Opp'n, ECF No. 22; Reply, ECF No. 26.) For the reasons discussed below, the Court **DENIES** the Motion.[1]

## II.   BACKGROUND

Ivar's Inc. is a Seattle-area restaurant chain and manufacturer of prepared foods for the retail market. (Mot. 2.) On March 26, 2020, Ivar's tendered a consignment of

---

[1] Having carefully considered the papers filed in connection with the Motion, the Court deemed the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.

1,250 cases of packaged clam chowder to Kool Pak, a common interstate motor carrier, for transportation by road from Ivar's in Mukilteo, Washington, to consignee Costco in Mira Loma, California.  (Compl. ¶¶ 2–4; Mot. 3.)  When Ivar's tendered the chowder to Kool Pak, it was refrigerated at a temperature of 35.7°F and otherwise in good condition.  (Compl. ¶ 3.)  Kool Pak issued a bill of lading No. 41388, agreeing to transport the chowder in a refrigerated trailer at a temperature between 33°F and 40°F.  (Consol. Statement Uncontroverted Facts ("CSUF") 5, ECF No. 27; Compl. ¶ 4; Decl. James Attridge ISO Mot. ("Attridge Decl.") Ex. C ("Bill of Lading"), ECF No. 18-2.)

On March 30, 2020, Kool Pak attempted to deliver the chowder to Costco at the destination.  (Compl. ¶ 5.)  Based on the activation of the time temperature indicator ("TTI") and Kool Pak's own temperature logs, the temperature within the refrigerated trailer that transported the chowder had exceeded 40°F for over four hours cumulative during the course of transport.  (CSUF 6.)  Kool Pak's own trailer temperature log demonstrated that the chowder was subjected to temperatures exceeding 40°F for over ten hours cumulative.  (CSUF 7.)[2]  Costco found the increased temperatures had caused an unsanitary condition under FDA guidelines relating to the prevention of botulism, and accordingly rejected the chowder shipment based on the TTI and Kool Pak's temperature logs.  (Compl. ¶ 5.)  Ivar's provided Costco with replacement chowder from existing stock.  (CSUF 4.)

Costco did not attempt to discern the internal temperature of the chowder before it was destroyed.  (CSUF 2; *see also* Compl. ¶ 5; Decl. Philip Fant ISO Opp'n ("Fant Decl.") Ex. 1 ("AGCS Resp. Interrogs.") No. 2, ECF No. 25-1.)  Ivar's did not attempt to salvage the chowder in the United States or Mexico.  (Attridge Decl. Ex. A ("AGCS Resp. RFAs") No. 4, ECF No. 18-2.)

---

[2] Kool Pak's objection to this statement of fact is **OVERRULED**.  (*See* CSUF 7.)  The fact is relevant and the temperature log does not require an expert's explanation to be understood.  Additionally, Kool Pak did not file its objection in a separate document pursuant to Court rules.  (*See* Scheduling and Case Management Order 8, ECF No. 16.)  Thus, to the extent Kool Pak's objection is directed to some other aspect of CSUF 7 or its supporting evidence, the objection is **OVERRULED**.

AGCS as Ivar's insurer indemnified Ivar's for the market value of the lost clam chowder.[3] (Compl. ¶ 6.) AGCS filed this action for cargo damage pursuant to the Carmack Amendment, seeking to recover the amount it paid to Ivar's from Kool Pak. (*See generally* Compl.) Kool Pak moves for summary judgment on the Carmack Amendment claim, or for partial summary judgment regarding the proper measure of damages. (Mot. 3–7.)

### III. LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986), and the court must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party, *Scott v. Harris*, 550 U.S. 372, 378 (2007).

Once the moving party satisfies its burden, the nonmoving party must go beyond the pleadings and cannot simply argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment. *See Celotex*, 477 U.S. at 322–24; *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Though the Court may not weigh conflicting evidence or make credibility determinations, there must be more than a mere scintilla of contradictory evidence to survive summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

"A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982). Only genuine disputes—where the evidence is such that a reasonable jury could return a verdict for the nonmoving

---

[3] The Complaint alleges the chowder had a "sound market value of $87,076.38" and that AGCS indemnified Ivar's "for its loss in the amount of $82,076.38." (Compl. ¶¶ 6–7.) This potential discrepancy is of no consequence to resolution of the Motion.

party—over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *See Anderson*, 477 U.S. at 248. The court should grant summary judgment against a party who fails to demonstrate facts sufficient to establish an element essential to his case when that party will ultimately bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322.

## IV.    DISCUSSION

Kool Pak moves for summary judgment on the grounds that AGCS cannot meet its prima facie case to establish a Carmack claim and that Ivar's did not mitigate its damages. (*See* Mot. 3–7.) Kool Pak also moves in the alternative for partial summary judgment that the measure of damages should be limited. (*Id.*)

### A.    Carmack Amendment

The Carmack Amendment, presently codified at 49 U.S.C. § 14706 *et seq.*, is a part of the Interstate Commerce Act and "provides the exclusive cause of action for interstate shipping contract claims." *Pac. Indem. Co. v. Atlas Van Lines, Inc.*, 642 F.3d 702, 707 (9th Cir. 2011) (quoting *White v. Mayflower Transit, L.L.C.*, 543 F.3d 581, 584 (9th Cir. 2008)). It limits a carrier's liability under an interstate bill of lading to "the actual loss or injury to the property caused by" the carrier. *Hall v. N. Am. Van Lines, Inc.*, 476 F.3d 683, 686 n.2 (9th Cir. 2007) (quoting 49 U.S.C. § 14706(a)). "[T]he statute codifies the common-law rule that a carrier, though not an absolute insurer, is liable for damage to goods transported by it unless it can show that the damage" was the result of an excepted cause.[4] *Mo. Pac. R. Co. v. Elmore & Stahl*, 377 U.S. 134, 137 (1964).

To establish a prima facie case of liability under the Carmack Amendment, a shipper must show "delivery in good condition, arrival in damaged condition, and the amount of damages." *Thousand Springs Trout Farms, Inc. v. IML Freight, Inc.*, 558 F.2d 539, 542 (9th Cir. 1977) (citing *Mo. Pac. R. Co.*, 377 U.S. at 138). The burden then shifts to the carrier to show "both that it was free from negligence and

---

[4] The excepted causes are not at issue for the purposes of Kool Pak's Motion.

that the damage to the cargo was due to one of the excepted causes relieving the carrier of liability." *Id.* (quoting *Mo. Pac. R. Co.*, 377 U.S. at 138).

Courts have recognized a number of ways in which a shipper may establish that goods arrived in damaged condition. These include, for instance, the nature of the damage, *Project Hope v. M/V IBN SINA*, 250 F.3d 67, 71 (2d Cir. 2001) (frozen diabetes medication); *Great Am. Ins. Co. v. USF Holland Inc.*, 937 F. Supp. 2d 376, 386 (S.D.N.Y. 2013) (frozen vaccines); a diminution in the cargo's value, *Oshkosh Storage Co. v. Kraze Trucking LLC*, 65 F. Supp. 3d 634, 637 (E.D. Wis. 2014) (unsealed cheese); and where cargo is rendered unfit for its intended use or perishable goods have spoiled, *Contempo Metal Furniture Co. of Cal. v. E. Tex. Motor Freight Lines, Inc.*, 661 F.2d 761, 763–64 (9th Cir. 1981) (pitted steel tubing); *Gordon H. Mooney, Ltd. v. Farrell Lines, Inc.*, 616 F.2d 619, 620, 623 (2d Cir. 1980) (spoiled fish). Generally, proof by statistical sampling has been deemed adequate evidence of damaged condition, provided the sample is sufficient to fairly indicate the damaged condition of the whole cargo. *See Thousand Springs*, 558 F.2d at 543; *S.C. Johnson & Son v. Louisville & Nashville R.R. Co.*, 695 F.2d 253, 259 (7th Cir. 1982); *Imperial Veal & Lamb Co. v. Caravan Refrigerated Cargo, Inc.*, 554 F. Supp. 499, 501 (S.D.N.Y. 1982).

Kool Pak contends AGCS cannot establish the second prima facie element, proof of arrival in damaged condition. (Mot. 5–6.) Kool Pak argues the temperature log is insufficient to establish the chowder was actually damaged. (*Id.* at 6.) Kool Pak urges the Court to reject AGCS's reasoning, based on FDA guidance, that the elevated temperatures subjected the chowder to unsanitary conditions and rendered the chowder unmerchantable. (*Id.*; Compl. ¶ 5.) According to Kool Pak, Ivar's was required to test the temperature of the chowder packages on arrival to prove they were actually damaged. (Mot. 6; Reply 3–4.)

In opposition, AGCS offers the trailer temperature logs and the opinion of its foodborne illness expert to establish that the chowder arrived in damaged condition.

(*See* Opp'n 3–8; Fant Decl. Ex. 2 ("Temp. Logs"), ECF No. 25-2.)[5] First, the temperature logs indicate the temperature in the trailer exceeded 40°F for more than ten hours cumulative over the forty-four-hour trip. (*See* Temp. Logs ("Supply Temp. (°F)"); Mot. 5 ("forty-four hour journey").) Thus, the chowder was exposed to temperatures exceeding what was acceptable for more than 20% of the trip.

AGCS also offers the declaration of its foodborne illness expert, Dr. Heidi Kassenborg, who describes why the FDA deems food adulterated and unfit for consumption under these circumstances. (*See* Decl. Heidi Kassenborg ISO Opp'n ¶¶ 5–13, ECF No. 23.) Dr. Kassenborg explains that seafood products are particularly susceptible to the toxin responsible for botulism; accordingly, the FDA has issued guidance for safe handling and transport which includes maintaining temperatures below 40°F. (*Id.* ¶¶ 6–8.) She explains that most bacteria, including the toxin that causes botulism, grow rapidly in temperatures exceeding 40°F, a range she refers to as the "danger zone," and that four hours cumulative in the danger zone "is the common limit for ready to eat potentially hazardous food." (*Id.* ¶ 8.) Dr. Kassenborg opines that, because the "shipment was subjected to temperatures exceeding 40°F cumulatively over [four] hours"—indeed, the logs reveal temperatures over 40°F for over *ten* hours—"Costco was justified, if not obligated, to reject the shipment." (*Id.*) Viewing the temperature logs and Dr. Kassenborg's expert opinion in the light favorable to AGCS, AGCS raises a triable issue as to whether the chowder arrived in damaged condition.

Kool Pak argues Ivar's should have tested each chowder package's internal temperature on arrival, to confirm they were all unmerchantable. (*See* Reply 4 (describing a methodology of testing chowder pouch temperatures, working from the

---

[5] Both parties submit the temperature logs, titled "Reefer Temperature – Detail," and do not object to the other party's exhibit. (*See* Attridge Decl. Ex. D ("Def.'s Temp. Logs"), ECF No. 18-2.) The temperature logs appear substantively identical, with the exception that Kool Pak's Exhibit D includes pages from another matter interspersed throughout the log pages. (*See id.*) Accordingly, for clarity, the Court cites only to AGCS's Exhibit 2 as the Temperature Logs.

edges of the trailer inward, to discern if any chowder was actually in the "danger zone").) Such a temperature test in these circumstances would have been pointless and impractical. Anyone who has unknowingly purchased a stressed gallon of milk at a supermarket understands this—a prior indecisive shopper removed the milk from the refrigerator case, shopped the aisles, and then rejected the milk and returned it to the refrigerated case—the milk may be at an appropriate temperature by the time the next unwitting shopper selects it, but it has already started to spoil from its journey around the store. Here, the undisputed fact is that the chowder was subjected to temperatures in the danger zone for more than ten hours cumulative over a forty-four-hour period of transport. Thereafter, the temperature on arrival "was of no consequence." *See Sunset Motor Lines, Inc. v. Lu-Tex Packing Co.*, 256 F.2d 495, 499 (5th Cir. 1958) (finding lowered temperature on arrival "of no consequence" where meat cargo had been subjected to elevated temperatures during transport, causing bacterial growth in the meat).[6]

Kool Pak seemingly would have Costco accept the danger zone chowder, sell it to its customers, and then when those customers complained of their foodborne illness, *that* would be sufficient evidence of the chowder's damaged condition. (*See* Mot. 6 & Reply 3 (both citing *Thousand Springs*, 558 F.2d at 543).) That is what happened in *Thousand Springs*, where thousands of pounds of trout were subjected to elevated temperatures during transport. 558 F.2d at 543. Upon delivery, employees were concerned about the elevated temperatures but visually inspected the fish and found no indication of damage. *Id.* So, they accepted the fish, immediately refrigerated it, and distributed it to various retail grocers. *Id.* As night follows day, the retail stores complained: the fish was spoiled. *Id.* Only then was the fish again

---

[6] Kool Pak's selective quotation of *Sunset Motor Lines* does not serve it well. (Mot. 6.) Kool Pak quotes the general rule, that a shipper is ordinarily bound to accept goods in damaged condition and may not reject them altogether, but the *Sunset* court continues that this is a "rule[] of reason" and it must "give way in the face of reason." *Sunset Motor Lines*, 256 F.2d at 498. Regardless, the court in *Sunset* was addressing the carrier's arguments regarding the proper salvage value of the goods, not whether the evidence established the fact of damage. *See id.* at 496–98.

inspected, and by that time, of course, there were visible and aromatic indications of decomposition. *Id.*

Here, rather than inflict spoiled chowder on its customers, Costco rejected the shipment based on concrete evidence that the chowder had been subjected to ten hours cumulative of unacceptably elevated temperatures. On arrival, the chowder would not likely have shown the visible or aromatic signs of damage like the trout in *Thousand Springs* eventually did, and even there, those signs appeared only after putting the public at risk of foodborne illness. A lack of visible signs of damage upon arrival is not dispositive. "Food distributors have a duty to ensure that the food they provide to the public is safe," and the requirement that perishable goods be maintained at certain temperatures provides assurance that the shipment is safe for consumption. *See Oshkosh Storage*, 65 F. Supp. 3d at 638. "Given the risk to customers and a distributor's own potential liability, it is not unreasonable for a company to adopt a policy of rejecting shipments of food products" that have been subjected to unsafe conditions, "as long as that policy has been clearly announced." *See id.* Here, the bill of lading clearly stated that temperatures above 40°F were not acceptable. (*See* Bill of Lading (indicating acceptable range 33°F to 40°F).)

The Court finds that the temperature logs and AGCS's expert's opinion sufficiently raise a triable issue of fact regarding whether the chowder arrived in damaged condition.[7] Accordingly, Kool Pak is not entitled to summary judgment on this basis.

**B.  Mitigation**

Kool Pak also argues it is entitled to summary judgment because Ivar's did not mitigate its damages. (*See* Mot. 6.) Kool Pak asserts that Carmack requires a shipper to salvage any unadulterated portion of the shipment. (*Id.*) Essentially, Kool Pak contends Ivar's should have sold some portion of the chowder to someone else.

---

[7] To be clear, the Court is not treating perishable cargo differently than other types of cargo at issue in a Carmack claim; rather, the Court finds the temperature logs and expert's opinion here sufficient to raise a material dispute over whether AGCS can prove the chowder arrived in damaged condition.

"Under the Carmack Amendment, [Kool Pak] has the burden to prove that the plaintiff did not exercise reasonable diligence in mitigating its damages." *Project Hope*, 250 F.3d at 78; *Allied Tube & Conduit Corp. v. S. Pac. Transp. Co.*, 211 F.3d 367, 372 (7th Cir. 2000); *Eastman Kodak Co. v. Westway Motor Freight, Inc.*, 949 F.2d 317, 319–20 (10th Cir. 1991). "The aggrieved party need only take reasonable steps under the circumstances of the particular case to mitigate its damages." *Eastman Kodak*, 949 F.2d at 320.

The Court is not persuaded that Kool Pak has met its burden here and instead concludes, for all the reasons discussed above, that AGCS raises triable issues regarding what steps would have been reasonable for Ivar's to take under the circumstances. Viewing the facts and evidence in the light most favorable to AGCS, a reasonable fact-finder could conclude that salvage or resale of any portion of the chowder shipment—which had been subjected to temperatures in the danger zone for bacteria growth for more than ten hours cumulative—would have been not only unreasonable, but also immoral.

Kool Pak is not entitled to summary judgment on this basis.

**C.   Measure of Damages**

Lastly, Kool Pak argues it is entitled to partial summary judgment on the issue of damages. (Mot. 7.) Kool Pak contends that, because Ivar's provided Costco with a replacement shipment of chowder from existing stock, AGCS's damages should be limited, as a matter of law, to the cost of manufacture of the replacement chowder, plus transportation costs, if any. (*Id.*) According to Kool Pak, permitting AGCS to recover the invoice value of the damaged shipment would award it "a windfall in the form of a double profit." (*Id.*)

"The general rule for determining the amount of damages is the difference between the market value of the property in the condition in which it should have arrived at its destination and its market value in the condition in which it did arrive." *Contempo Metal*, 661 F.2d at 764 (first citing *Gulf, Colo. & Santa Fe Ry. v. Tex.*

1 *Packing Co.*, 244 U.S. 31, 37 (1917); and then citing *F.J. McCarty Co. v. S. Pac. Co.*, 428 F.2d 690, 692 (9th Cir. 1970)). However, the rule is "not absolute" and will not be "applied in cases where it is demonstrated that another rule will better compute actual damages." *F.J. McCarty*, 428 F.2d at 692; *see also Ill. Cent. R.R. Co. v. Crail*, 281 U.S. 57, 64–65 (1930) (holding that the market value measure "may be discarded and other more accurate means resorted to, if, for special reasons, it is not exact or otherwise not applicable").

Kool Pak relies on *Oak Hall Cap & Gown Co. v. Old Dominion Freight Line, Inc.*, 899 F.2d 291 (4th Cir. 1990), for its argument that the measure of damages should be limited to the costs of manufacture. (*See* Mot. 7; Reply 7.) In *Oak Hall*, a shipment of specialty academic gowns was rendered worthless by smoke damage during transport. 899 F.2d at 292–94. The court found that the general rule—market value less salvage—was not the best measure of actual loss in that case because the evidence demonstrated "that Oak Hall secured substitute goods . . . , lost no sales, and had no opportunity for a sale with the[] damaged goods." *Id.* at 296. Accordingly, the court found that Oak Hall's actual loss was only "the cost of replacing the damaged merchandise." *Id.*

Here, in contrast, as AGCS correctly notes, nothing in the record suggests that Ivar's was ever paid for the original shipment, that the existing chowder stock would not have been otherwise sold, or that the cost of the existing chowder stock was any different than that for the production of the original shipment. (Opp'n 8.) Kool Pak does not "show that [Ivar's] could not have sold and earned profit on two batches of unharmed product." *See Eastman*, 949 F.2d at 319–20. Therefore, Kool Pak fails to establish the absence of a triable issue regarding the proper measure of damages and is not entitled to partial summary judgment on this issue.

///

///

///

### V. CONCLUSION

For the reasons discussed above, the Court **DENIES** Defendant's Motion for Summary Judgment. (ECF No. 18.)

**IT IS SO ORDERED.**

April 12, 2023

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**